# NOTES OF CASES DECIDED

IN THE

# COURT OF APPEALS,

JULY 13, 1853.

---

THE BOARD OF SUPERVISORS OF CHENANGO COUNTY *against* THE PEOPLE, on the relation of Jay M. Scott.

*Mandamus; validity of Militia Act of* 1851.

AT the annual meeting of the board of supervisors of the county of Chenango, held in November, 1851, the military rolls of several towns in said county were, by the supervisors of such towns, delivered to the board, which rolls were completed as required by the act of April 16, 1851, entitled "An act for the enrollment of militia, to abolish militia fines in certain cases, and to exempt members of uniformed companies from working on highways, and serving on juries."

The board refused to comply with the provisions of said act, by annexing warrants to the town assessment rolls, directing the collectors to collect the sum of fifty cents from every person appearing by the said assess-

ment roll liable to pay the same, as other town taxes are collected, and to pay the same to the county treasurer, as the statute required.

A special meeting of the board was held on the 29th December, 1851, when they were requested, on behalf of the Adjutant General, and of the relator, to cause the said sums to be collected, but they refused to issue any warrant for that purpose, or to do anything about collecting said tax.

In January, 1852, the Supreme Court, at special term in Courtland county, on the application of Lieutenant-Colonel Scott, issued an alternative mandamus to said board of supervisors, requiring them forthwith to re-assemble and cause the said duty to be performed, and in case of refusal, that they should make return to the general term in May then next.

The supervisors made return to the writ, declining to issue their warrant as required, and showing for cause: 1st. That the military tax was not assessable by the act during the year 1851, the act not taking effect until January, 1852.   2d. If it was assessable in 1851, it could only be done at the annual meeting of the board in November; and, as that day had passed before the writ was served, their power and duties were exhausted. 3d. That the assessment rolls and warrants, duly signed for the collection of the general tax in said towns, were issued about the 25th of November, 1851, and were in the hands of the collectors, and the board had no power to obtain possession of them.   4th. That the board had no power then to alter the assessment rolls already issued.   5th. That there was no power given by the military act to the board to issue new warrants for the collection of the military tax.   6th. That the supervisors had no control over the assessment rolls filed with the town clerks.   7th. That if the board had issued their warrant at the special meeting, December 28, 1851, or at their special meeting, in pursuance of the

alternative mandamus, on the 16th February, 1852, there was no time to collect the said military tax at the time required by law. 8th. That if the board had obeyed the writ, and issued their warrant, it would have been contrary to law, illegal and void; the act of 16th April, 1851, being oppressive and unconstitutional in its passage, and having remained so ever since. Therefore they could not issue the warrant as required.

The people demurred to the return, assigning various special causes of demurrer, not necessary to be stated.

The Supreme Court, at general term, ordered a peremptory mandamus, commanding the said supervisors to assemble within twenty days after service of the mandamus upon the several members of the board, and to cause to be collected the sum of fifty cents from every person appearing by the said military rolls liable to pay said military commutation, and that they should issue their warrants for that purpose. The court also adjudged that the board of supervisors should pay the costs of the proceedings.

That judgment was affirmed by the Court of Appeals, the court holding, that the act was in force in 1851, and that it did not require the presence of three-fifths of all the members elected to each house of the legislature on its final passage.

That, if that were otherwise, no objection could be made in this case on that ground, as no question of that kind was presented by the pleadings. Nor, for the same reason, could the objection be made (if the fact were so) that the question on the final passage of the bill in either house was not taken by yeas and nays, or that the yeas and nays were not entered on the journal.

The legal presumption is, that a law published under the authority of the government was correctly passed, so far at least as relates to matters of form.

A bill, required to be passed when three-fifths of all the members elected were present, and which was actu-

ally so passed, would not be made void by the neglect of the presiding officers to certify that fact.

WILLARD, J., on looking at the journals of the two houses, was satisfied that three-fifths were present in each house when the bill was passed, and that the question on its final passage was taken in each house by yeas and nays, and duly entered on the journals, and that the requisite number of votes was given in its favor.

That it was not necessary for the senate, in receding from two of its amendments, which were not concurred in by the house, to take the yeas and nays upon that question.

That the neglect of the board of supervisors to do their duty, at the proper time, had not rendered a substantial compliance with the statute impossible. That they, or the successors of those then in office, could be convened, and could issue their warrant for the collection of the several assessments; and that a mandamus was a proper process to compel the performance of this duty.